## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| CARLOS HENRY NERIO | § |
| | § |
| V. | § CAUSE NO. A-17-CA-037-LY |
| | § |
| DEREK EVANS and AMY KING | § |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO: THE HONORABLE LEE YEAKEL
UNITED STATES DISTRICT JUDGE

Before the Court are Defendants Evans and King's Motion for Summary Judgment (Dkt. No. 32); Plaintiff's Response (Dkt. No. 37); and Defendants' Reply (Dkt. No. 40). The District Court referred the above motion to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules.

## I. FACTUAL BACKGROUND

Carlos Henry Nerio brings this § 1983 case against Texas Department of Public Safety Officers Derek Evans and Amy King, in their individual capacities, alleging false arrest and false imprisonment in violation of his Fourth Amendment rights.[1] The following undisputed facts come from the summary judgment record, and are set forth in the light most favorable to the Plaintiff. In 2015 and 2016, DPS was investigating a methamphetamine distribution network headed by Frank Lee Dones, Jr. The lead investigator, and the primary decision maker regarding the investigation was King. Dkt. No. 32-3 at 4; 32-4 at 7-9. As part of that investigation, DPS conducted surveillance of Dones, used a confidential informant to make a controlled methamphetamine buy from him, and

---

[1]Nerio's complaint originally brought the claims under both the Fourth and Fourteenth Amendments, but the Fourteenth Amendment claim was previously dismissed on the Defendants' motion. Dkt. No. 11 at 2.

obtained court orders authorizing pen registers and a Title III wiretap for two of Dones' telephones. The pen register reflected that one of Dones' frequent callers was a person using telephone number xxx-xxxx-2438. Once the wiretap was in place, officers listened in on, or read the texts of, communications between Dones and the phone number ending in 2438. On May 4, 2016, texts indicated that the person with the 2438 phone number—one of whose texts starts with the statement "This is Carlos"—was traveling to Dones' house to purchase methamphetamine. A DPS surveillance team was sent to Dones' house and observed a person exit his vehicle, enter Dones' residence, return to his car shortly thereafter and drive away.

The summary judgment evidence is muddy at best regarding how the investigators linked these events to the Plaintiff in this case. King testified that at her direction a DPS analyst ran an ACCURINT search of the 2438 telephone number, which reflected that the number was subscribed to a person named Carlos Nerio at an address on Ed Bluestein Blvd. Dkt. No. 32-3 at 9-10; 22-23. When officers investigated that address, they determined it was the Cricket Wireless store where the phone was purchased. *Id.* at 23. King also testified that on the day that the drug buy took place (May 4, 2016), and independently of her request for the search of the 2438 phone number, the surveillance team identified the vehicle they witnessed drive to the Dones' residence to conduct the drug buy as a silver Chevrolet pickup truck and obtained its license plate number. *Id.* at 19-20. The plate was run in a database, and returned to a Carlos Nerio who resided on Tapo Lane. *Id.* at 31-32. What happened next is opaque, at best. King stated in her deposition that she herself did nothing to trace the owner of the Chevy truck. She explained:

    A:    So the reason I didn't is because I—like I said, I wasn't working surveillance or the wire room that day. It just so happened my lieutenant was in the wire

2

> room, and he was the one that had the license plate ran on the vehicle the surveillance team called in. And so he was the one that did that.
>
> Q. That's Lieutenant Leggett?
>
> A. Yes. And I'm assuming because of the way it works is he also asked communications for a driver's license photo or a return.
>
> Q. And that's when Lieutenant Leggett sent you the personal information about Mr. Nerio?
>
> A. Yes.

Dkt. No. 32-3 at 19. In other words, based on the license plate, Leggett tracked down a driver's license and its related information, and emailed that to King. The information King received from Leggett contained a driver's license photo of the Plaintiff, as well as other identifying information for him, including an address on Wandering Way, not Tapo Lane. *Id.* at 20-21. There is no evidence in the record explaining how, using the license plate number called in by the surveillance team—which the undisputed evidence reflects tied to a Carlos Nerio residing on Tapo Lane—Leggett sent King identifying information for a Carlos Nerio residing on Wandering Way. Indeed, the record is undisputed that the Carlos Nerio who actually was the suspect in this case lived at the Tapo Lane address, and had a Texas driver's license. Dkt. No. 37-1 at 1. Thus, a search based on the license plate should have returned results for him, not the Plaintiff. Why it did not is a mystery on which the summary judgment evidence casts no light. Nevertheless, at an unstated point after she received the driver's license photo of the Plaintiff, King claims the surveillance officers who were present during the drug buy reviewed that photo and "were sure that was the person—that was Carlos Nerio." Dkt. No. 32-3 at 26; Dkt. No. 37-1 at 13.

King and Evans concede that no one involved in the investigation ever made a single surveillance visit to the Tapo Lane address. *Id.* at 32; Dkt. No, 32-4 at 18. No one ever researched who owned that house, either. Dkt. No. 32-3 at 32. On the other hand, Evans and King both made numerous surveillance runs by the Wandering Way house. Dkt. Nos. 32-3 at 12-13; 32-4 at 13; 17. Despite the numerous visits, they never once saw the Chevy truck at the Wandering Way address, though they did observe two different vehicles registered to the Carlos Nerio—the Plaintiff—who lived there. *Id.*[2] Apparently neither King nor Evans thought anything was odd about the fact that the Chevy truck seen at the drug buy was never at the Wandering Way house during the numerous surveillance visits made to that house.

As it happens, Carlos Nerio—the true subject of the officers' investigation—and Carlos Henry Nerio— the person arrested—are step-brothers, who, in addition to sharing the same name, also share the same father (but not the same mother). But the Carlos Nerio who lived on Tapo Lane is ten years older, three inches shorter, and 50 pounds heavier than the Plaintiff. Dkt. No. 37-1 at 1. More significantly, that Carlos Nerio has no eyebrows or hair on his head, as a result of an explosion at a methamphetamine lab, while the Carlos Nerio who is the Plaintiff has eyebrows and a full head of dark hair. *Id.* at 1, 3-4. On this very point, the summary judgment evidence creates another significant mystery. Evans testified that during the investigation he was shown the photos in the summary judgment record of both the Plaintiff and the "true" Carlos Nerio:

> Q: Let me show you what's been provided to us as 137 [Dkt. No. 37-1 at 4] and ask you if that person looks familiar?

---

[2]Another of the many unexplained mysteries in the evidence relates to testimony from Evans' deposition, where he describes the vehicle that the suspect drove to Dones' residence to conduct the only drug buy that agents witnessed as a "little brown—brownish four-door car." Dkt. No. 32-4 at 14. Everything else in the record indicates that it was a silver Chevrolet pickup truck.

4

A: The picture looks familiar.

Q: I'm sorry?

A: The picture looks familiar.

Q: When have you seen the picture?

A: During the investigation or after the—all of this lawsuit information.

Q: And tell me how that came about.

A: At some point during the investigation after one of the surveillances—probably a day or two after—maybe that evening—I don't recall—I was showed two pictures of Mr. Nerio, to my recollection, and it was those two pictures. Well, that one I think is a newer picture. I think the picture of him even at that time—

Q: On 106?

A: —was different. I think that was a newer deal photo. I think that was after the arrest, to be honest with you. But I don't know.

* * *

Q: Okay. And so you were shown the photographs of the two people in 106 and 137 pages; is that correct?

A: I can't be specific that it's the exact same pictures. But those are what I recall, yes.

Q: They appear to be the same?

A: Yes.

Q: And were you shown these pictures prior to the arrest of Mr. Nerio or after his arrest?

A: Prior.

Q: And who showed them to you?

A: Lieutenant King—

Q: Okay.

A: —I think. It might have been Lieutenant Leggett. But I think it was Lieutenant King.

Q: Where did that take place?

A: At our office.

Q: And what were the circumstances why—

A: We were corroborating information that we had gained through surveillance and the Title III.

Q: And so if you were—Why were there pictures of two different Carlos Nerios shown to you? Was there some discussion that maybe the wrong Carlos Nerio was going to be arrested?

A: No.

Q: Do you know why there were two pictures shown to you of Carlos Nerio?

A: Because there's two people that come up in the driver's license database system that have the same name.

Q: Okay. And was—Were those two pictures shown to you before you wrote the probable cause affidavit?

A: Yes.

Q: Okay. Do you remember how many days?

A: Months.

Dkt. No. 32-4 at 25-27. Thus, at some point before the arrest, the investigators were explicitly aware that there were two Carlos Nerios relevant to their investigation. And despite this knowledge, as mentioned above, they never investigated one of those individuals, instead focusing for unknown reasons solely on the Plaintiff. They never investigated who lived at the Tapo Lane address, or sought to determine if the Carlos Nerio who owned the Chevy truck who participated in the drug

6

buy, and who lived at the Tapo Lane address, was the person their investigation was focused on. And they did this despite never having seen the Chevy truck at the Wandering Way residence they went by several times.

Nevertheless, based on the investigation described, King (after consultation with an assistant DA) gave Evans instructions to prepare a complaint charging Carlos Nerio (the Plaintiff) with participating in a felony drug conspiracy. Dkt Nos. 32-3 at 27, 34; 32-4 at 21-22. Evans drafted an affidavit for a complaint and arrest warrant. Dkt. No. 32-4 at 22. The arrest warrant named the target as "Carlos Henry Nerio, Jr.," and stated that he resided on a street called "Wandering Way." Dkt. No. 32-5 at 2. The complaint affidavit identified the defendant as simply "Carlos Nerio." *Id.* at 3-4. Other than the identifying information on the face of the warrant, all of which related to the Plaintiff, very little evidence regarding how the officers identified Nerio is contained in the affidavit itself. The affidavit states phone number 2438 had numerous calls to and from Dones that appeared to be related to drug purchases, and then added three connecting facts: (1) the phone was subscribed to a Carlos Nerio who "resides at 7112 Ed Bluestein Blvd.;" (2) a search of Facebook showed results for the 2438 number "belonging to Nerio;" and (3) a registration check of the vehicle that arrived at Dones' house to participate in what appeared to be a drug purchase "showed Nerio as the registered owner." Dkt. No. 32-5 at 3-4, ¶¶ 5, 6 & 13.

Evans submitted the documents to a state magistrate on June 22, 2016. Based on the affidavit, the magistrate issued the arrest warrant that day. *Id.* At 5:30 in the morning of June 30, 2016, police officers, including Evans (but not King), traveled to the Plaintiff's home on Wandering Way and arrested him. Plaintiff and his wife objected that he had not committed any crime and that officers were arresting the wrong person. Thus, though he was not the person that officers had seen

make a drug purchase from Dones, nor the person who had the telephone and text conversations related in the complaint, Carlos Henry Nerio was nevertheless arrested and jailed. He was charged with Criminal Conspiracy to commit Felony Manufacturing/Delivery of a Controlled Substance, and his bond was set at $25,000. As a result of the arrest, he was forced to hire counsel and pay a bondsman to obtain his release. Further, the local news reported on the arrest, and the stories included Nerio's photo, which led to him being fired. It took him two months to have the charges dismissed, based on the prosecution's motion stating the reason as mistaken identity. Dkt. No. 37-1.[3]

Evans and King move for summary judgment asserting that: (1) they are entitled to qualified immunity; and (2) the actions of the magistrate in issuing the arrest warrant after a finding of probable cause insulates the Defendants from liability.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions

---

[3] For reasons not explained in the evidence, no investigation was ever conducted on, nor charges brought against, the Carlos Nerio who lives on Tapo Lane and owns the Chevy truck that the officers saw being driven to the drug buy. Dkt. No. 32-3 at 15. Further, at least at the time of her deposition, and despite the evidence described above, King (who has since been promoted to a lieutenant in the DPS) insists that the Plaintiff—not the other Carlos Nerio—is the person who committed the crime in this case. Dkt. No. 32-3 at 37.

of [the record] which it believes demonstrate the absence of a genuine issue of material fact.' " *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325. "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). "Once the moving party [meets its initial burden], the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536. In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

### III. ANALYSIS

**A.  Qualified Immunity**

Qualified immunity protects government employees from civil liability in their individual capacities insofar as their conduct does not violate clearly established statutory or constitutional

9

rights of which a reasonable person would have known. *Wernicke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009). Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable under the circumstances presented in the case. *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 408 (5th Cir. 2007). Qualified immunity shields from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If raised as a defense, the burden is on the plaintiff to demonstrate the defendant is not entitled to qualified immunity. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir.2002) (en banc). This inquiry requires a two-step process. *Pearson v. Callahan*, 555 U.S. 223 (2009). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In recent years, the vast majority of cases involving qualified immunity at the Supreme Court and circuit courts have been decided on the second prong.

Despite the fact that this is a false arrest case based on a misidentification, and that there is a healthy body of law addressing § 1983 false arrest claims arising out of mistaken identification, the parties do not discuss those cases in their briefs.[4] The leading Supreme Court case on this issue

---

[4]To be fair, the Plaintiff does make a passing reference to one of these cases—*Hart v. O'Brien* —and to a case out of the Northern District of Mississippi, but spends no time focusing on the many other cases much more on point with the facts of this case. The Defendants, on the other hand, make no mention of *any* of these cases their motion, and only discuss *Hart* in their reply, and only because the Plaintiff mentioned it. Further, there are numerous documents referenced in the deposition testimony, or the briefing, which are not included in the summary judgment record. Putting it mildly, the briefing, and particularly the Defendants' briefing, was not of much help to the Court.

10

is *Baker v. McCollan*, 443 U.S. 137 (1979), and the most-cited Fifth Circuit case is *Blackwell v. Barton*, 34 F.3d 298 (5th Cir. 1994). *Baker* is not quite on point with our case, however, as it addressed the *post*-arrest failure of officers to realize they had the wrong person in custody:

> respondent's complaint is simply that despite his protests of mistaken identity, he was detained in the Potter County jail from December 30, when Potter County deputies retrieved him from Dallas, until January 2, when the validity of his protests was ascertained. Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution.

443 U.S. at 143-44. The facts of *Blackwell* are closer to those here. The officer was executing an outstanding warrant for a "Melinda K. Allen." The officer had information that Allen "worked in health spas and went by the name 'Mindy.'" *Blackwell*, 34 F.3d at 300. He thus went to a local health club and asked for "Mindy." The receptionist told him that Mindy was teaching an aerobics class[5] but would be finished soon. *Id.* When the class ended, the instructor, whose name was Mindy Michelle Blackwell (not "Allen"), met with the officer, who informed her he had an outstanding warrant for her arrest. She protested her innocence of any crime, and gave the officer her driver's license. He did not look at the license, and instead put it in his pocket. He asked her to follow him in her car to the police department, which she did. Once at the jail, two officers there knew Blackwell, and within minutes the mistake was cleared up—the officer escorted Blackwell back to her car and she left. *Id.* In all, the encounter lasted 25 minutes. *Id.* On these facts, the Fifth Circuit concluded that Barton (the officer) was entitled to qualified immunity because his actions were objectively reasonable. The court explained that there was no evidence "Barton knew or believed he was or likely was arresting someone other than Melinda Allen. The person he arrested was of the same height and weight, sex, race, age, nickname, and at the location where he expected to find

---

[5]*Blackwell* is a case, after all, from the 1990's.

11

Melinda Allen." *Id.* at 304. The court noted more generally that the "Fourth Amendment is not violated by an arrest based on probable cause, even if the wrong person is arrested, if the arresting officer had a reasonable, good faith belief that he was arresting the correct person." *Id* at 303 (citing *Hill v. California*, 401 U.S. 797 (1971)).

In both of these cases, and in the vast majority of the cases involving arrests because of a misidentification (including *Hill*), the arrest took place when police officers were executing a valid warrant, but mistakenly concluded the person in their custody was the person wanted by the warrant. Thus, in *Hill* the officers arrested the wrong person on an outstanding warrant, and the Supreme Court concluded that the mistake did not give rise to a constitutional violation, because the officers had made an objectively reasonable—though mistaken—conclusion that the person they apprehended was the subject of the warrant. *Hill*, 401 U.S. at 802-803. As the First Circuit explained in another misidentification case,

> *Baker* and *Hill* have been construed, and rightly so, to mean that where there is a facially valid warrant or probable cause for arrest, and here there were both, the only question is whether it was reasonable for the arresting officers to believe that the person arrested was the one sought.

*Gero v. Henault*, 740 F.2d 78, 84-85 (1st Cir, 1984).

Though there is a wealth of case law involving this sort of misidentification, there are far fewer opinions involving the subset of cases (like this one) where the misidentification takes place *during* the investigation of a crime. Importantly, this is a distinction that makes a difference. In the former cases, the warrant does not purport to demonstrate probable cause to believe the person who was actually arrested committed a crime, but instead the warrant is aimed at a completely different person. In the latter cases, the warrant actually claims that there is probable cause to believe the

*wrong* person committed a crime. The reason that the cases like the former may not be relevant to a case like this one is the differences in what would be reasonable for officers to do in each situation. Given the inherent time and resource limitations available to an officer making an arrest in the field, it may be reasonable to do less to identify a person when executing a warrant in those circumstances than it would when attempting to identify a person officers are investigating. In an ongoing investigation like this one, the officers have the luxury of time, significant resources, multiple investigators, and tools like wiretaps, pen registers, pole cameras and surveillance. Because of this, it is not obvious that cases involving a mistaken identification made when executing an existing warrant are relevant to a case like this one.

As one district court faced with a similar fact scenario explained the difference, the more common cases "address[ ] the reasonableness of an officer's mistake when executing a warrant in the field, not the requirements of an investigation to establish probable cause." *Parks v. Town of Leicester*, 2012 WL 2088926 *8 (D. Mass. June 7, 2012). In discussing *Hill* and whether it had any application to a case where investigators target and obtain a warrant for the wrong person, the judge in *Parks* argued that

> the decision in *Hill* addressed only the reasonableness of an officer's judgment in identifying a person as the suspect who is sought and against whom a warrant has issued. Here, by contrast, the arresting officers did not mistake plaintiff for the person who was named in the warrant—she *was* the subject of the warrant. The decision in *Hill* does not appear to bear directly on the issue here: whether a coincidental match between a suspect's name and the name in a database record is sufficient to establish probable cause against the person listed in the database.

*Id.* at *9 (emphasis added). Interestingly, this judge's discussion of *Hill* arose out of his analysis of an unpublished Fifth Circuit opinion with similar facts. *See McAllister v. Desoto County, Mississippi*, 470 Fed. Appx. 313 (5th Cir. 2012) (per curium). In that case, officers were

13

investigating the sale of narcotics by a person they knew as "Connie Mac." *Id.* at 316. By running a license plate number from a car at Connie Mac's residence, the officers identified their suspect as "Connie McAllister." *Id.* Though the actual drug dealer was named "Connie Faye McAllister," an unknown member of the investigative team placed identifying information for the plaintiff, whose name was simply "Connie McAllister," in the case file. That information came from the sheriff's database containing information on people who had been arrested or jailed. Several months later the case file was sent to the district attorney's office, and a grand jury indictment was obtained for the Connie McAllister whose information was in the file. *Id.* at 315-16. Relying on the Supreme Court's decision in *Hill*, the Fifth Circuit concluded that the arrest did not violate the plaintiff's Fourth Amendment rights. *Id.* at 319. The court decided that it was reasonable for officers to assume, without further investigation, that a person with the name "Connie McAllister" who had prior arrests was the drug dealer they were after. *Id.* at 319-20.

Because it is an unpublished decision, *McAllister* is not binding authority. 5TH CIRCUIT RULE 47.5.4. In addition, as the district judge in *Parks* noted, the Fifth Circuit's application of *Hill* to the facts in *McAllister* is not "especially persuasive." 2012 WL 2088926 *8. He added:

> The probability of multiple persons with the same name residing in a single geographic region—at least one as populous as Worcester County—is not negligible. Basing probable cause solely on a similarity of name could create a substantial risk of error. Arguably, an officer who pursued such a practice would be acting in reckless disregard of the truth.

*Id.* Given that *Hill* did not involve officers obtaining a warrant for the wrong person, but instead executing an existing warrant on the wrong person, it is less than clear to the undersigned that the

14

*McAllister* court properly applied *Hill*.⁶ Moreover, just as the *Parks* court found the investigating officers' reliance on a single database match "troublesome," the undersigned is equally troubled by King's and Evans' cavalier identification of their suspect in this case. To say that the investigation of Nerio's identity was sloppy is being kind. There is no reasonable explanation in the evidence before the Court for why the officers did not investigate the Tapo Lane address directly linked to the Chevy truck the officers witnessed at Dones' house—the one and only time they saw their suspect interact with the alleged ring leader. And Evans' testimony that he actually looked at photos of both of the "Carlos Nerios" during the investigation makes the lack of any investigation into the Nerio living on Tapo Lane even more problematic. Even King admitted that had she seen the photograph of the "real" Carlos Nerio before the arrest it would have merited additional investigation. Dkt. No. 32-3 at 26.

The Court need not decide whether King and Evans' actions crossed the line from negligent to "plainly incompetent," however. Even if the Court concluded that their actions amounted to a constitutional violation, the Court could not conclude that the law on this issue was "clearly established" at the time.⁷ As already discussed, in 2012 in *McAllister*, the Fifth Circuit, looking at

---

⁶The only other authorities the circuit court relied on in *McAllister* were *Blackwell* and the unpublished opinion in *Harris v. Payne*, 254 Fed. Appx. 410 (5th Cir. 2007). As in *Hill*, the misidentifications in both *Blackwell* and *Harris* took place at the time of the execution of an already existing warrant, and not during the initial identification of the alleged criminal.

⁷In his response, Plaintiff argues that the judge-made qualified immunity doctrine is a legally impermissible defense to the § 1983 claims, and notes that there is a growing body of scholarly authority urging the abandonment, or significant modification, of the doctrine. Dkt. No. 37 at 6-7. One of the biggest criticisms of the doctrine is that the manner in which the Supreme Court has applied the "clearly established" prong of the analysis has led to it being nearly impossible for a plaintiff to ever overcome the defense, regardless of how severe a state officer's misconduct might be. For example, since 2012, the Supreme Court has concluded in each of the 12 cases raising the issue that qualified immunity applied because the right at issue was not "clearly established."

15

a very similar fact scenario, concluded that no constitutional violation had occurred. Though the decision was unpublished, and thus not precedential, it certainly would not have given law enforcement officers reason to know that use of a single database, without more, to identify a suspect would violate a person's Fourth Amendment rights. If anything, it could have caused officers to reach the opposite conclusion. And in this case, officers used not just a driver's license database to identify Carlos Nerio, but "confirmed" their identification by showing the driver's license photo of the Plaintiff to officers who had obtained a glimpse of the suspect during surveillance of the drug buy at Dones' residence.[8] Under existing Supreme Court precedent, to conclude that a right was "clearly established" for qualified immunity purposes requires the existence of at least one circuit court case recognizing the right at issue based on a *very* similar factual scenario. As the Supreme Court has stated it, "[u]nder our cases, the clearly established right must be defined with specificity." *Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019). In 2017, the Court stressed "the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S.Ct. 548, 552 (2017). And in 2018, it said that "[t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138 S.Ct. at 589 (internal quotation marks and citations omitted). Plaintiff has failed to point to any Fifth Circuit or Supreme Court case with facts close to those here, which found a Fourth Amendment violation under such facts. Because this is

---

[8]The surveillance officers, of course, were not also shown the driver's license photo of the Carlos Nerio who owned the truck they had seen, and thus there is no way to know if it would have changed their conclusion.

required to overcome the Defendants' claim of qualified immunity, summary judgment is appropriate here.[9]

## IV. RECOMMENDATION

In light of the foregoing the undersigned **RECOMMENDS** that the district judge **GRANT** Defendants Evans and King's Motion for Summary Judgment (Dkt. No. 32) based on qualified immunity, and **DISMISS** Nerio's claims against them **WITH PREJUDICE**.

## V. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas*

---

[9]Defendants also contend that they are entitled to summary judgment based on the independent intermediary doctrine. Given the qualified immunity decision, the Court need not, and will not reach that issue. Had the Court reached the issue, it is unlikely that the doctrine would have been available to the Defendants, however, given that all of the factual statements in the probable cause affidavit that purported to tie Plaintiff to the drug buy were false: (1) the Carlos Nerio who subscribed to the relevant phone number did not "reside at" the Ed Bluestein address, as officers confirmed that address was a Cricket Wireless store; (2) the results of a Facebook search of that phone number did not reflect it "belong[ed] to Nerio," because no Facebook search was ever done; and (3) a registration check of the vehicle that arrived at Dones' house to participate in what appeared to be a drug deal did not "show[ ] Nerio as the registered owner," since that license plate came back to a Carlos Nerio on Tapo Lane, while the Plaintiff resided at a different address.

*v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 19th day of June, 2019.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE